We have four cases scheduled before us today. One of the cases, 17-2015, will be resolved on the briefs. So we have three oral arguments. The first argument is Howell v. OOC, number 17-1755. Mr. Leib, I understand you're going to reserve five minutes of your time for rebuttal, is that correct? Okay. You may proceed. Thank you. Good morning. May it please the Court. I'd like to address some of the issues raised by the respondent, OOC, in terms of its brief. I would like to correlate that with the timing of the leave restriction and the proposal to terminate and the firing in the instant matter. With regard to the respondent's brief on pages 18, 30, and 35, they respectively say that Mr. Leib, I have a couple of questions for you. You raised several arguments that may not have been raised before the Board, and I want to clarify whether they were. You challenged AOC's de facto no-fault leave policy at page 42 of the blue brief. Did you raise that below? I did raise it below. Give me a cite, okay? I'm sorry? Give me a cite. I can't do that right now, Your Honor. Perhaps in the rebuttal I'd be able to, but in response to that, I would say that it's to be used for excessive absences, and FMLA leave, approved FMLA leave, and all the other leave that was used for purposes of the excessive absences, it was approved and then it was used later on to bring an action against him. Therefore, no fault. You had a certain number of hours, unspecified number of hours, to approach excessive absences, which is purely subjective, and an employee has absolutely no idea. When did it become excessive? Did you raise entrapment by estoppel? Yes, Your Honor, please. If I didn't raise it by the words, I raised it by the actions and what it was. Once again, he's being penalized for something that had been approved earlier, and now he's being sanctioned for it in terms of the excessive absences. I would also- Wait, wait, wait, wait, wait, wait. You have a whole section, entrapment by estoppel in the incident matters, starting at 43. You cite authorities. Did you raise that below? I did not raise it in the manner that it's raised in the brief. I raised it in a manner by arguing, so to speak, that you cannot penalize someone subsequent post hoc after he's been given approved leave. You allege at 55 to 57 that Mr. Howell was retaliated against for opposing the notice of his proposed termination. Did you raise that? Yes, I did. Where was that? If Your Honor, please, that's raised by the factor that there was no temporal proximity. The hearing officer said there was no temporal proximity between the 2007-8 and the suspension of Supervisor Krupe with regard to the 2014-2015 proposal to terminate. Those are factual statements. Did you raise the doctrine? I believe, if not raised by characterization, I raised it by the factual circumstances. You assert a cat's paw theory of retaliation. Again, the factual narrative supports the fact that all these other people certified. Your answers are doing you no good, Mr. Lee, because you know perfectly well that if you didn't raise it below as a legal argument, then it's not right for us to hear. If Your Honor, please, when it's raised by factual narrative as opposed to putting a categorization on it or a characterization or a, quote, quote, legal theory on it, it's still raised by the factual narrative. It's raised in the complaint as a factual narrative with the allegations pursuant thereto, whether or not cat's paw. What's your authority for that? I can't necessarily provide you an authority for that, but I would say if the factual narrative fits that pattern, then the legal argument can be raised. All right. Okay. Well, we've done the house cleaning. I don't think we've cleaned up the mess, but okay. That answers my question. Once again, on page 18, the respondent says the petitioner was provided more FML leave than the statute provides. There is no number given. Let's focus a little bit more on your arguments as opposed to the arguments of your opponent. The AOC offered to repeat the pre-termination hearing, the 752 hearing, and that repeat of that termination hearing would be unconditional. You say that it was not unconditional, that there were conditions attached. What conditions were attached? The same conditions. There were no conditions attached. It was simply another hearing. But if you have another hearing... It was an unconditional... But if you have another hearing, which is no more than a kabuki dance in the Office of Compliance, if you have another hearing and you're not permitted to raise issues of void... So you argue in your brief that conditions were attached, and now you're saying that there were no conditions attached. There were no conditions, but if I'm not given specifics in terms of the fact that, yes, I can raise constitutional issues, void for vagueness, I can raise discrimination and retaliation issues based on... Not for under the CAA, but based for impeachment evidence and for exculpatory evidence. If none of those things, and it's strictly the same kind of a hearing he got the first time, then there's no way he's going to be successful on another hearing. So that's why you denied it? Yes. If you look at the factor of quibono, who does it benefit? It doesn't benefit the petitioner. All it is is a rerun. I'm given no specifics in terms of it. Matter of fact, there are no specifics for such a hearing to take... Mr. Lee, at the argument, you're arguing that, well, it wouldn't have made any sense for me to go to the hearing because some things I would have raised, they wouldn't pay any attention to. That is correct. That's what I understand you to say. That is correct, Your Honor. Now, let me tell you what I'd do if I'd been in your shoes, because I would have realized that the argument being made against me if I didn't go to the hearing, right? I would have gone to the hearing, and I would have said, I'm at the hearing, and I'm going to raise five arguments, and I know you're going to reject them, but I'm going to raise them because I'm going to preserve them for appeal, because you know what? When I lose, I'm going to go up on appeal, and I'm going to argue those very points that you rejected me on were legally incorrect. I'm going to preserve them. Lots of times you go to hearings knowing that there are issues that may be resolved against you, but you go in order to state your grand, stake out your term, preserve the issue for appeal, because the truth of whether or not those arguments you wanted to make were properly excluded for you remains to be seen once you test them on appellate review. See what I mean? I understand what you're saying, Your Honor. I would say there was no procedure available to hold such a hearing. He would have to have the termination vacated. Well, you're arguing you couldn't have made some constitutional arguments. Well, maybe it's so that the hearing examiner doesn't have the authority to hear those arguments. We will not know that until you frame the issue at a hearing someday, get ruled on flatly, and then come up and argue the ruling is wrong, right? In response to you, I would also say that by our operation of law, it should not have been raised at the Office of Compliance hearing, because the mediation, any type of mediation is confidential. Well, you see my point. I mean, we... I certainly see your point. I'm not trying to tell you how you should argue on behalf of your client, but it seems to me that when you say, well, I didn't want to go to a hearing because some arguments I might have made would have been rejected, it doesn't seem to me to be a very good argument for not going to the hearing, but that's my take on it. And my take is it would not have been beneficial, number one. Number two, there was no procedure to enable it. The hearing officer, the first decision at the AOC would have had to have been vacated. He would have to have been reinstated, and then he could hold a hearing, which means he would have to have been paid for approximately 13 or 14 months since termination. So there was absolutely no realism to the offer when it was made. Are you finished? Do you want to reserve the rest of your time? Yes, I would. Okay. Thank you. Mr. Woolman, did I pronounce your name correctly? Correct. Alright. One of those German names, it's difficult. May it please the court this morning, I think there's really only one issue here, and that's whether there is substantial evidence to support the board's decision and the hearing officer's decision. I think even a cursory review of this record reveals that there was more than ample evidence to support the conclusions reached by the hearing officer and the board. I think the most telling evidence that the hearing officer found was the testimony of the two supervisors. One of the supervisors had kept a log of the reasons why he had been absent. I think there were 40 occasions in the fall. 22 of those had nothing to do with any type of alleged disability. Was the accuracy of those logs in dispute? Well, I'm not sure they were. I mean, certainly the hearing officer found the testimony to be very believable. He said they were contemporaneous records that he made at the time. It's understandable why he started making those records after you have an employee who is a constant no call, no show. And many of the incidents were not in dispute. For instance, there was a period of five days where he didn't call in at all, and then came in on the sixth day and came in late. And the excuse was that he was helping his family in New Jersey and didn't call at all. So I mean, that alone, under the AOC's policy, would be enough to discharge him. How did the MS of the appellant affect him? Was it his motor facilities, his cognitive facilities? Well, again, the medical evidence was not, the AOC had asked him to update the medical form, so it was a little unclear in terms of what restrictions he had. There was a form that suggested he had some lifting restrictions, and they did try to accommodate him. They would basically, wouldn't have him do any of the heavier work. They usually worked in teams. He worked as a high voltage electrician working on heavy equipment. So he would be given the lighter tasks. So they tried to, even though there wasn't, the evidence was really in dispute in terms of what it was his restrictions were. And they kept working with him, asking him to give us something more. But the evidence doesn't seem to be about whether he could fulfill his work or not. It was whether he was at his work. Exactly. I mean, when you have, like I said, 40 occasions, most of them no calls, no shows. I mean, not showing up at all. I mean, if anything, the supervision seemed to have exercised an extraordinary amount of patience. I mean, they worked with him. They tried to convince him of the necessity of coming into work and of calling into work and letting us know what's going on. And really that went on for a period of two years before they finally started taking some action. So I think there was, if you look at this record, and you look at why the hearing officer made the decisions that he made, it's really hard to see how you could make any other decision based on this record. You said that of the unexcused absences, 22 of them were circumstances in which there was no connection to his disability. And the ones that was a connection to the disability, had he clearly made a good case for needing leave for those events? I don't think he had. I mean, the issue with the leave restriction was that if he was going to be gone for some type of illness, he had to come back with some type of medical excuse showing that there was some type of illness there. What I'm trying to get at is to analyze the exact absences for which he was taxed. I mean, a large number of them. And I was just querying about the ones in which he might have said, well, you should have excused that because of my disability. And again, I think they weren't excused. I mean, they were either... Well, the record seems to show that they asked him for those medical... Exactly. Medical leave record. Right. And that he just would refuse to or fail to provide them to them. So they said, well, if you went to the doctor, we'd like to see the doctor. You know, excuse them. And it would never come up. So those remain coded as absent without official leave, AWOL. And I mean, he would have the opportunity to recode those as leave without pay if he could bring in the medical excuse. Thank you. Okay. Thank you very much. Thank you. Mr. Lee, you have a little bit over five minutes. Yes, sir. With regard to the law with these absences, 40 absences, 22 of which were allegedly non-MS related or non-disability related, and the other 16 or whatever, which were MS related or related to his disability regarding sleeping, which is one of the resulting disabilities, ADA disabilities from the MS, which was acknowledged and verified in three separate WH-380s in 2012. Now, with regard to the further medical information that's asked for in 2013, that comes at the end of the FMLA period of time. The leave restriction comes on January 23rd. His last FMLA was December 28th. It comes within one month of his FMLA expiring in 2012. With regard to the update that they want in February 15, which comes within that long period of time, he was out of work. It was all related to the MS. With regard to the lighter tests, his initial WH-380... Why didn't he provide notes from the doctor when asked for them? Because he was sick. He provided them subsequent. Where are they in the record? They are not in the record, but they were accepted. The 2013 hours that he was out, that he was charged, quote, quote, AWOL, he provided medical documentation when he was capable of going back to the doctor. He provided it. I'm sorry. But that's not in the record. How can you say that when it's not in the record? I know how I'm putting it in the record, but the medical documentation, and I will search the record again for it, and I would apologize to the court for that. But I would say performance-wise, he was satisfactory. He performed satisfactory. But for the absences, the absences... The only way, I think, to understand this case, Your Honors, is the fact that when he had FMLA, they didn't do anything to him. When they started the log or the chart in September 2012, they never provided him with any notice of infractions that he could respond to it at the time that these alleged incidents took place that Supervisor Krupe wrote these things. When he was under FMLA, there was responsibility on the agency. The AOC to provide him with some kind of an ADA interactive process. That onus under 825.702 of their regulations. The onus is on the employer. When you deal with the ADA under the FMLA, you're required to not necessarily deal with a neutral policy in terms of leave, so to speak, but to deal with the specific disabilities. And that's in 42 U.S.C. But the factual record looks like they bent over backwards to accommodate him. What we have in the record... If I may interrupt you, Your Honor. They bent over backwards after their liability was over in 2013. January 1, 2013, what they had to do prior to that, they did not have to do subsequent to that because he had no FMLA in 2013. There's absolutely no... And so they were not required, quote, quote, unless you look at him as being regarded as disabled based on his sleeping difficulties. If you regard it as disabled, which they did recognize, then they were responsible to look at an ADA aspect of the case. But presumably coming from FMLA to ADA in Section 825.702 of the OOC regulations, FMLA regulations, in their mind, the way I see it, is the ball was dropped by them and they could pick it up and bring... Aside from the regulations, again, you're focusing on something I think that's not at the core or go to the heart of your appeal. I mean, you're appealing that there's things that were not provided to your client. And Judge Wallach points out that the record indicates that they bent over backwards to assist your client at times. What is it more that they could have done? They could have determined whether or not an ADA reasonable accommodation by virtue of changing his shift because he seemed to be able to handle a later shift. And there had been a vacancy in that period of time for a 3 to 11 shift. Did he suggest that somewhere in the record? He didn't suggest that anywhere in the record because the man is a high voltage electrician. The man does not know about HRMD, about human resources. Does he know he's functioning better if he had a later shift? That was only determined later in the year and later in 2013 after he got infusions of one type of medicine and after he got medicine, other new type medicine. So you say it was only determined. That's a passive voice. Who determined that? He did. He recognized it. And once he recognized it, where in the record did he suggest that to his employer? It's not in the record. All right. Thank you. Thank you. Okay. Thank you very much.